**JOSEPH A. HOLPUCH CO. v.
UNITED STATES.**

No. 43809.

Court of Claims.

May 7, 1945.

See also 67 F.Supp. 949.

Norman B. Frost, of Washington, D. C., (George M. Weichelt, of Chicago, Ill., on the brief) for plaintiff.

William A. Stern, II, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for the defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHALEY, Chief Justice.

The plaintiff contracted with the defendant November 29, 1933, to construct 16 company officers' quarters at Fort Sam Houston, Texas. It was a Federal Emergency Administration of Public Works project.

The work required of the plaintiff construction of the foundations, as well as of the superstructure. Subsurface conditions were of an unstable nature and the contract specified concrete piers for the foundations with reinforcing steel. The reinforcing steel was, as the findings state, a structure within itself, and had to be rigid in order to withstand the displacing action of pouring and puddling of concrete. This reinforcing structure consisted of spirals and uprights and a controversy arose as to the means of securing spiral and upright together in such manner as to assure regularity and rigidity. Defendant's officers insisted that plaintiff was required to use what is termed a "spiral spacer." The plaintiff objected, but furnished and used it. The plaintiff claims extra compensation for having done so, but its claim fails for one reason, if no other. The extra expense entailed is not satisfactorily proven. The extra expense, if any, may not have been easy to prove, but the proof must at least give us the obvious offsets, such as the expense of an alternative method of accurately placing and securing the spiral. The spiral did have to be accurately placed and secured by some method. The plaintiff is not entitled to recover on this item.

The matter of bricklayers' wages, which plaintiff paid in excess of that which it had expected to pay, is more difficult of determination.

Bricklayers are skilled laborers and the contract provided that skilled labor should be paid not less than $1.00 an hour, but enough to make their wages just and reasonable, "sufficient to provide, for the hours of labor as limited, a standard of living in decency and comfort."

There were further provisions. Wages should not fall short of rates agreed upon between labor unions and employers, prevailing on April 30, 1933.

Article 18(e) (f) of the contract provided:

"(e) The minimum wage rates herein established shall be subject to change by the Federal Emergency Administration of Public Works on recommendation of the Board of Labor Review. In event that the Federal Emergency Administration of Public Works acting on such recommendation establishes different minimum wage rates, the contract price shall be adjusted accordingly on the basis of all actual labor costs on the project to the contractor, whether under this contract or any subcontract.

"(f) The Board of Labor Review shall hear all labor issues arising under the operation of this contract and as may result from fundamental changes in economic conditions during the life of this contract. Decisions of the Board of Labor Review shall be binding upon all parties."

The plaintiff was charged with notice as to the union scale in effect April 30, 1933, for its contract was not entered into until the following November. Plaintiff was safeguarded against a future rise in wages effected by the Federal Emergency Administration of Public Works and the Board of Labor Review, for adjustment of the contract price to meet the increase was mandatory.

While plaintiff's work was in progress the Board of Labor Review ruled that bricklayers' wages on another Government job at San Antonio should be $1.25 an hour. This ruling the constructing quartermaster communicated to the plaintiff, and ordered plaintiff to increase bricklayers' wages to $1.25 an hour accordingly. Plaintiff put the increase into effect, under protest, and gave notice of claim for the difference between the original minimum of $1.00 and the new scale of $1.25.

The plaintiff was informed by the constructing quartermaster that he might appeal to the Board of Labor Review. But it was plainly of no special interest to plaintiff to make such an appeal, for the contract provided an automatic increase in contract

price to cover such an increase in wages. Increasing the wages increased the contract price, without further order.

The constructing quartermaster construed the ruling of the Board of Labor Review to apply to the vicinity of San Antonio, and this was a reasonable construction to make, for the wages prevailing in the vicinity were the wages to apply to a contract within that vicinity, and Fort Sam Houston and San Antonio are in the same vicinity.

■ The ordered increase of 25 cents an hour in the wages increased the contract price under the terms of Article 18(e) of the contract, and the plaintiff is entitled to recover $821.63. Overhead and profit may not be included. The adjustment in contract price is limited to the consideration of "actual" labor costs.

■■ The next item is an increase in lumber prices due to the fact that one of plaintiff's material men increased the price of lumber over the original quotation. The lumber company increased its prices because of the lumber code, a feature of the national industrial recovery program. But there is no provision in the contract in suit which passes such an increase on to the defendant. And the plaintiff can not of course sue under the act of June 25, 1938, 52 Stat. 1197, 41 U.S.C.A. § 28 note, for the contracts covered by that act had to be entered into on or before August 10, 1933, and plaintiff's contract was not entered into until November 29, 1933. As a matter of fact the Lumber Code Authority published its code prices October 30, 1933, and in the instant case bids were not opened until November 20, 1933. There is discoverable no legal basis for plaintiff's claim for increase in lumber prices, and the item can not be included in a judgment in plaintiff's favor.

■ The next item is for an alleged short payment on footing depths.

Pier foundations were required, and the footings were to rest on undisturbed soil. The specifications provided:

"Excavations for footings shall be carried down to the depth and levels shown on the drawings."

The depth of excavations for footings was shown on the drawings as 33 feet from the finished floor of the building.

The specifications went on to provide:

"However, should suitable bearings not be encountered at the levels shown on drawings, they shall be carried to such levels as may be necessary and approved by the C. Q. M. [Meaning the constructing quartermaster].

"Authorized increase or decrease in amount of excavation shall be paid for by or credited to the U. S. as per amount mentioned for excavating under 'Unit Prices' of bid."

In spite of the fact that the footing depths were shown on the drawings as 33 feet, and that the excavations were required by the above provision to be carried down to the depths shown on the drawings, deeper if necessary, the specifications in the immediately succeeding section provided:

"For estimating purposes the depth of foundations will be estimated at 37 feet 6 inches below first floor level. The unit prices quoted in bid will govern for any additions or deductions."

Here is an inconsistency. The pay basis was to be, by reference to the drawings, 33 feet, then the pay basis is declared to be 37 feet 6 inches.

It is manifest that the uniformity of depth shown on the drawings, 33 feet, was not expected to be attained for the specifications required the excavation to "extend to block clay or other soil which in the opinion of the C. Q. M. has sufficient bearing value for the purpose intended."

Thus a variation in depth was clearly contemplated, and indeed the provision that should suitable bearings not be encountered at the levels shown on drawings, they should be carried to such levels as might be necessary and approved by the constructing quartermaster, indisputably confirms the probability of variation. So that the 33-foot depth shown on the drawings was at most merely an average depth.

And it very nearly turned out to be that way, for the average depth finally was 32.49 feet.

948

It happened that the maximum depth excavated for the foundations was 37 feet 6 inches, the minimum 29 feet. In settlement for the work defendant's officers deducted the unit prices provided for that purpose, for the presumed saving or shortage in excavation between the maximum of 37 feet 6 inches and the minimum of 29 feet, calculated of course on the actual footage.

The plaintiff contends that the pay basis should be 33 feet and not 37 feet 6 inches.

This was not a controversy over what work the contract and its specifications required. It is a question of how the contract price is to be computed. The contract indicates on its face that it is "To be paid by the Finance Officer, U. S. Army, Fort Sam Houston, Texas." So the responsibility for making correct payment was on the Finance Officer, the paying officer and of course, bonded.

The Finance Officer's payment of the contract price must necessarily have been his own responsibility. The decision of the contracting officer as to the amount thereof would have been advisory, at the most, and there was no appealable decision confronting the plaintiff.

The 33-foot and 37-foot 6-inch provisions are so close together in the wording of the contract they must be read together. The plaintiff had as full a notice of the 37-foot 6-inch provision as it had of the 33-foot and may not say it was misled.

It is impossible to reconcile the two provisions. The 33-foot pay basis is the more logical of the two, for the 33 feet were shown on the drawings and that turned out to be approximately the average, and such a pay basis would involve both deductions and additions to the contract price. The "33 feet" shown on the drawings was not a required minimum, for the actual and accepted minimum depth was 29 feet.

On the other hand, the 37-foot 6-inch pay basis was the actual accepted maximum, and used as a pay basis that meant deductions only from the contract price, no additions whatever.

The two contract provisions do not fit into each other. If one is adopted it must be to the exclusion of the other. There is no ambiguity about either one, taken by itself. But there is this to be said about the 33-foot pay basis—it involved additions to as well as deductions from the contract price when the work was done and the accounts cast up. By using the 37-foot 6-inch pay basis there resulted no additions whatever to the contract price, only deductions, a one-sided proposition, somewhat to plaintiff's discomfiture. It was superfluous to talk about additions to the contract price, if there were to be none.

Logic and reason tip the balance in favor of the 33-foot pay basis, for that basis permits additions as well as deductions, which the other basis does not, and put to the selection, the 33-foot basis must prevail, to the exclusion of the other.

On the 33-foot basis the recovery would be $5,793.19, and the plaintiff is entitled thereto.

 The last item to be considered is the claim of $1,776.00 for liquidated damages alleged to have been improperly withheld. The history of the delay for which liquidated damages were assessed is given in some detail in the findings of fact. They reveal that the constructing quartermaster took things into his own hands, giving precedence to excavating work on other contracts, preventing the plaintiff from getting its own subcontractor working on the project with which we are here concerned. The order in which the excavation was thus required to proceed was for the Government's convenience, and while it may have expedited work on other contracts, its effect was to delay plaintiff's work and was chargeable to the acts of the Government, for which plaintiff was not responsible. The delay was plainly excusable under the terms of Article 9 of the contract, and gave no basis for withholding liquidated damages. There was no administrative finding as to the causes of the delay from which the plaintiff might appeal.

 Up to that point the case is all for the plaintiff, but the plaintiff neglected to set in motion its right to remission of liquidated damages, for it did not notify the contracting officer as to the delay as required by Article 9 and thus place upon the contracting officer the duty of investigating the matter, and extending the time for

performance. The Government reserved the right to have the contracting officer investigate the matter, if the contractor was to have liquidated damages remitted. Having failed to prepare the necessary foundation for its claim, the plaintiff could not expect the paying officer to do aught else than withhold the liquidated damages, and the plaintiff may not recover them.

Plaintiff is entitled to recover $6,614.82. It is so ordered.

MADDEN, and LITTLETON, Judges, concur.

JONES and WHITAKER, Judges, took no part in the decision of this case.